UNITED STATES DISTRICT COURT
SOUTHERN DISTRICR OF FLORIDA

Case No. 13-22399-Civ-COOKE/TORRES

ANGELA SAMUELS, ROSSANA TORRES,
DANIELLE STELLUTO, NATIONAL LOW
INCOME HOUSING COALITION, and
RIGHT TO THE CITY ALLIANCE,

     Plaintiffs,

vs.

FEDERAL HOUSING FINANCE AGENCY
and EDWARD DeMARCO, Acting Director,

     Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION
## TO DISMISS THE FIRST AMENDED COMPLAINT

     Plaintiffs Angela Samuels, Rossana Torres, Danielle Stelluto, National Low Income Housing Coalition, and Right to the City Alliance (collectively "Plaintiffs") filed their First Amended Complaint for Declaratory and Injunctive Relief ("First Amended Complaint") (ECF No. 30) against Defendants Federal Housing Finance Agency and Edward DeMarco (collectively "Defendants") seeking the following three forms of relief: (1) that this Court vacate and set aside the Federal Housing Finance Agency's (FHFA) decision to "indefinitely"[1] suspend payments to the Housing Trust Fund as null and void; (2) that this Court declare that the FHFA unreasonably withheld or delayed review of its decision to suspend the Housing Trust Fund payments, and require the FHFA to undertake an immediate review of its decision; and (3) that this Court order the FHFA to instruct Fannie Mae and Freddie Mac to make all suspended payments into the Housing Trust Fund as if the FHFA's decision to indefinitely suspend payments never occurred. *See* First Am. Compl. at 30-31.

---

[1] Plaintiffs characterize the suspension as indefinite; however, Defendants use the term "temporary."
[2] These facts are taken directly from the Plaintiffs' First Amended Complaint. *See Beck v. Deloitte & Touche*, 144 F.3d 732, 735 (11th Cir. 1998) ("In evaluating the sufficiency of a complaint, a court must accept the well pleaded facts as true and resolve them in the light most favorable to the

Defendants challenge this Court's subject-matter jurisdiction over this dispute arguing that Plaintiffs lack standing because their "alleged injury is exceedingly remote from the actions they challenge, making it highly speculative that the Court could redress it," and because "the decisions whether and, if so, when to revisit the suspension of Housing Trust payments and (assuming such reconsideration were to take place) whether to terminate the suspension fall within the Director's unreviewable discretion to determine whether such payments would contribute to the Enterprises' continued financial instability." Mot. Dismiss at 2. I agree.

## I.     BACKGROUND[2]

Angela Samuels, Rossana Torres, and Danielle Stelluto (collectively, "Individual Plaintiffs") are extremely low-income tenants without any permanent housing. First Am. Compl ¶¶ 1, 7. Plaintiff Danielle Stelluto has been living in a New York City homeless shelter with her two children. First Am. Compl ¶¶ 31, 38. Plaintiff Angela Samuels is living doubled up with a family member. Plaintiff Rossana Torres has been forced to live in temporary arrangements with relatives. First Am. Compl ¶¶ 8-10, 15, 17. All have been searching diligently for affordable housing and have been unable to find any. First Am. Compl ¶¶ 18, 28, 36. Plaintiffs National Low Income Housing Coalition and Right to the City Alliance ("Organizational Plaintiffs"), are non-profit membership corporations composed of individuals, many of whom are extremely low income individuals in need of affordable housing, and other local or statewide organizations, dedicated to expanding the supply of affordable housing to extremely low-income families. First Am. Compl ¶¶ 51-53, 57-61.

Defendant Federal Housing Finance Agency (FHFA) is the federal agency, created by Congress on July 30, 2008, through the Housing and Economic Recovery Act of 2008, P.L. 110-289 (HERA). FHFA is charged with oversight of the secondary mortgage market including Fannie Mae and Freddie Mac. Shortly after the passage of HERA, Fannie Mae and Freddie Mac were placed into conservatorship and FHFA was named as the conservator. First Am. Compl ¶ 65. Defendant Edward DeMarco is the Acting Director of

---

[2] These facts are taken directly from the Plaintiffs' First Amended Complaint. *See Beck v. Deloitte & Touche*, 144 F.3d 732, 735 (11th Cir. 1998) ("In evaluating the sufficiency of a complaint, a court must accept the well pleaded facts as true and resolve them in the light most favorable to the plaintiff.").

FHFA and, as such, is charged with the administration and enforcement of all functions, powers and duties of FHFA. As the Director, Defendant DeMarco has the statutory authority, pursuant to 12 U.S.C. § 4567, to make the necessary findings to suspend the statutorily required payments from Fannie Mae and Freddie Mac to the Housing Trust Fund. First Am. Compl ¶ 66.

Federal Statute 28 U.S.C. §1338 requires the Secretary of Housing and Urban Development (HUD) to establish, by regulation, a formula to distribute amounts made available under this subsection to each state to provide affordable housing to extremely low- and very low-income households. The statute further provides criteria for that allocation. Pursuant to the command of 28 U.S.C. §1338, the Secretary of HUD proposed regulations for the administration of the Housing Trust Fund and the distribution of its funding. 75 Fed. Reg. 66978-01, 2010 WL 4255283. First Am. Compl ¶¶ 44-45. In 2008, Congress created the Housing Trust Fund, as part of the Housing and Economic Recovery Act of 2008 (HERA), P.L. 110-289 (July 30, 2008). First Am. Compl ¶ 79. Congress intended the national Housing Trust Fund to be funded with a percentage of the annual business of Fannie Mae and Freddie Mac. The Housing and Economic Recovery Act of 2008 funded the Housing Trust Fund through contributions mandated by Section 1131(b), which amended Section 1337 of the Federal Housing Financial Safety and Soundness Act of 1992, 12 U.S.C. § 4567(a). First Am. Compl ¶ 80.

In the fall of 2008, Fannie Mae and Freddie Mac were placed in conservatorship and the Defendant FHFA was named as the conservator. When Fannie Mae and Freddie Mac were first placed in conservatorship they received a substantial infusion of capital from the U.S. Treasury through the Treasury's purchase of preferred stock, for which the Treasury received a yearly dividend of 10 percent. Overall, the U.S. Treasury has invested approximately $116 billion in Fannie Mae and $72 billion in Freddie Mac. Fannie Mae and Freddie Mac have made all yearly dividend payments and have not accessed any additional capital infusions since the second quarter of 2012. Importantly for the issues presented, in the fall of 2008, the Federal Defendants instructed Fannie Mae and Freddie Mac to suspend all payments to the Housing Trust Fund pursuant to 12 U.S.C. § 4567(b)[3]. Since that time,

---

[3] 12 U.S.C. § 4567(b) states, "The Director shall temporarily suspend allocations under subsection (a) by an enterprise upon a finding by the Director that such allocations--(1) are contributing, or

despite repeated requests, the Federal Defendants have failed and refused to revisit or review their suspension of payments. First Am. Compl ¶¶ 84-85. On or about April 15, 2013 Plaintiffs National Low Income Housing Coalition and Right to the City Alliance wrote to the Federal Defendants and demanded that the Federal Defendants review their initial determination to suspend the statutorily required payments to the Housing Trust Fund. Federal Defendants failed and refused to acknowledge or respond to that request. First Am. Compl ¶ 88.

Counsel for Plaintiffs appealed the Defendants' refusal to respond and on July 8, 2013, Defendants provided two letters instructing Fannie Mae and Freddie Mac to suspend allocations pursuant to Section 1337 of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended. As stated in the letters, the suspension was based on findings (a) that the amount of the contribution would further contribute to the financial instability of the Enterprises; and (b) that, while FHFA has suspended capital classifications, it was anticipated that the Enterprises would be required to draw funds from the U.S. Treasury to maintain a positive net worth. First Am. Compl ¶ 90.

Plaintiffs posit that due to the actions of the Federal Defendants in suspending payments to the Housing Trust Fund, the Organizational Defendants have had to divert substantial funds and resources away from actual implementation of the Housing Trust Fund and had to specifically redirect those resources to advocacy for basic funding for the Housing Trust Fund. First Am. Compl ¶¶ 54-55, 62-64. Despite the record profits of Fannie Mae and Freddie Mac, and despite the statutory requirement that any suspension of payments be temporary, the Federal Defendants have failed and refused to review these findings and/or discontinue their suspension of the statutorily required payments by Fannie Mae and Freddie Mac into the Housing Trust Fund. First Am. Compl ¶ 91.

## II.   LEGAL STANDARD

Defendants move for the dismissal of Plaintiffs' First Amended Compliant pursuant to Federal Rule of Civil Procedure 12(b)(1), under which a district court must dismiss a claim over which it lacks subject-matter jurisdiction. As courts of limited jurisdiction,

---

would contribute, to the financial instability of the enterprise; (2) are causing, or would cause, the enterprise to be classified as undercapitalized; or (3) are preventing, or would prevent, the enterprise from successfully completing a capital restoration plan under section 4622 of this title." 12 U.S.C. § 4567(b).

"[f]ederal courts are expected to monitor their jurisdictional boundaries vigilantly." *America Fiber & Finishing, Inc. v. Tyco Healthcare Group, LP*, 362 F.3d 136, 139 (1st Cir. 2004).

For that reason, the Court is obligated to inquire into whether it has subject matter jurisdiction over this case, *see, e.g.*, *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 507 (2006), which includes an inquiry into Plaintiffs' standing. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) ("Standing is a doctrine that 'stems directly from Article III's 'case or controversy' requirement,' and thus it 'implicates our subject matter jurisdiction.'") (quoting *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003)). "The standing inquiry focuses on whether the plaintiff is the proper party to bring this suit. . . ." *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

"[I]n order to have Article III standing, a plaintiff must adequately establish: (1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (i.e., a ' 'fairly ... trace[able]' ' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is ' 'likely' ' and not 'merely 'speculative' ' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). Plaintiffs, as the party invoking federal jurisdiction, bear the burden of establishing these elements. *Lujan*, 504 U.S. at 561.

To acquire subject-matter jurisdiction, the alleged injury must be legally and judicially cognizable. "This requires, among other things, that the plaintiff have suffered 'an invasion of a legally protected interest which is ... concrete and particularized,' and that the dispute is 'traditionally thought to be capable of resolution through the judicial process.'" *Raines*, 521 U.S. at 819 (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968)) (internal citations omitted). Certain Administrative Procedure Act challenges under 5 U.S.C. § 701(a) are not judicially cognizable. Specifically, "judicial review is unavailable where '(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.'" *Norton*, 324 F.3d at 1234.

### III. DISCUSSION

#### A. Plaintiffs Lack Article III Standing

##### 1. Individual Plaintiffs

The Individual Plaintiffs' injuries are too remote to establish standing required by Article III. To meet the standing requirements of Article III, causation is required, meaning "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Raines*, 521 U.S. at 818 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)); *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). Redressability is a "substantial likelihood" that the requested relief will remedy the alleged injury in fact." *Vermont Agency of Natural Res.*, 529 U.S. at 771.

Here, Plaintiffs' injury is not fairly traceable to the defendant's allegedly unlawful conduct. While Plaintiffs are correct that "the mere involvement of third parties [does] not preclude standing," Pls.' Opp'n at 4 (citing *Warth v. Seldin*, 422 U.S. 490, 505 (1975)), it is not substantially likely, without making several unguaranteed assumptions regarding the manner in which the relief may impact Plaintiffs, that the requested relief will remedy the alleged injury in fact. The contributions to the Housing Trust Fund would have to be distributed to the state governments of Florida and New York, which would then have to distribute funds and subsidies to potential developers to develop low-income housing in their communities– who remain unidentified. The Plaintiffs then would have to be eligible for and actually receive the available low-income housing. As Defendants properly recognize, Plaintiffs' "effective relief is contingent on the acts of numerous third parties not before the Court, and is therefore impermissibly speculative." Mot. Dismiss at 5.

##### 2. Organizational Plaintiffs

"[A]n organization has standing to sue to redress injuries suffered by its members without a showing of injury to the association itself and without a statute explicitly permitting associational standing." *Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir. 1999). In *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), the Supreme Court acknowledged that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343. Thus, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). As explained above, the Individual Plaintiffs lack standing because their injury is too remote from the Defendants' allegedly unlawful conduct. However, this finding does not foreclose the Organizational Plaintiffs' opportunity to establish standing.

An organizational plaintiff may also meet the general standing requirements applied to individuals. *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). In this respect, courts "must determine whether [the organization plaintiff] has alleged such a 'personal stake' in the outcome of the controversy as to warrant the invocation of federal-court jurisdiction." *Id.* This "personal stake" may be shown by "[s]uch concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] ... more than simply a setback to the organization's abstract social interests." *Id.* "Indeed, '[t]he organization must allege that discrete programmatic concerns are being directly and adversely affected' by the challenged action." *Id.* (quoting *American Legal Foundation v. FCC*, 808 F.2d 84, 91 (D.C. Cir. 1987)).

The Organizational Plaintiffs allege that they were required to redirect energies to educating and advocating as to the importance of a national Housing Trust Fund and the necessity for funding and implementing it. Because the Housing Trust Fund was not funded, they were unable to continue their core technical assistance and training functions that they would have undertaken to implement the Housing Trust Fund had it been funded. While a close call, I find that the Organizational Plaintiffs have not alleged "injury in fact fairly traceable to the defendant's allegedly unlawful conduct" sufficient to satisfy the requirements of Article III.

In *Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268 (D.C. Cir. 1994), the court found that Fair Employment Council demonstrated "injury in fact" adequate for Article III standing when it alleged that it conducted community outreach and public education, counseling, and research projects, and that the defendant's discriminatory actions "interfered with these efforts and programs" and "reduced the

7

effectiveness of any given level of outreach efforts," potentially increasing the number of people in need of the Fair Employment Council assistance. 28 F.3d at 1276. Yet, the *Fair Employment Council* court "explicitly reject[ed] the Council's suggestion that the mere expense of testing BMC constitutes 'injury in fact' fairly traceable to BMC's conduct." *Id.* Rather, it determined that

> The diversion of resources to testing might well harm the Council's other programs, for money spent on testing is money that is not spent on other things. But this particular harm is self-inflicted; it results not from any actions taken by BMC, but rather from the Council's own budgetary choices.

*Id.* This causation piece of Article III standing is vital. *Raines*, 521 U.S. at 818. Similarly, while the Organizational Plaintiffs may have suffered an injury by diverting its resources to educating and advocating as to the importance of a national Housing Trust Fund, this was a decision made by the Organizational Plaintiffs. *See also Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) (declining to find Article III standing where the organization plaintiff "has merely chosen to devote its resources to challenge [defendant's] conduct by filing this suit, much like the 'self-inflicted harm' of challenging a regulation.").

### B. Exercise of APA's "Discretionary Function" Precludes Judicial Review

Even assuming, *arguendo*, that Plaintiffs – Individual or Organizational – were able to establish standing sufficient to bring claims for judicial review of an agency action, such review cannot proceed because 12 U.S.C. § 4567 does not set forth adequate standards against which to judge whether the Defendants failed to act.

1. <u>Agency Action Determined to be Unlawfully Withheld or Unreasonably Delayed is Actionable.</u>

The Administrative Procedure Act ("APA") provides that "a person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof." 5 U.S.C. § 702. For the purpose of § 702, "agency action" has the meaning as defined by § 551. Looking to § 551, it defines "agency action" as "the whole or part of an agency *rule, order, license, sanction, relief* or the equivalent or denial thereof, or *failure to act*." 5 U.S.C. § 551(13) (emphasis added).

As noted above, the gravamen of Plaintiffs' First Amended Complaint confronts Defendants' failure and refusal to "review" its findings and/or discontinue their suspension

of the statutorily required payments by Fannie Mae and Freddie Mac into the Housing Trust Fund. *See generally* First Am. Compl. Because Plaintiffs' alleged injuries stem from the defendant's "failure and refusal" to revisit its decision under 12 U.S.C. § 4567(b), Plaintiffs are seeking relief under § 706(1) for Defendants' failure to act. 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed.").

In 2004, the Supreme Court further defined "failure to act." *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 61-64 (2004). In *Norton*, the Southern Utah Wilderness Alliance and others (hereinafter "SUWA"), brought suit against the Bureau of Land Management ("BLM"), its Director, and the Secretary. SUWA sought relief from BLM's failure to act to protect public lands in Utah from damage cause by off-road vehicles. The Supreme Court understood "failure to act" as "a failure to take an agency action." *Id*. at 62. "The important point is that 'failure to act' is properly understood to be limited . . . to a discrete agency action." *Id*. Moreover, only "legally required" action can be compelled under the APA. *Id*. at 63. Therefore, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Id*. at 64.

The actions here Plaintiffs seek to have reviewed are: (1) the FHFA's decision to temporarily suspend Freddie Mac and Fannie Mae's contributions to the Housing Trust Fund; and (2) the FHFA's refusal to review that decision. The Defendants are not legally required to take such actions, and therefore, they are judicially unreviewable.

    2. <u>Judicial Review of FHFA's Discretionary Decision is Foreclosed Where Meaningful Standards for Review are Absent.</u>

The APA's comprehensive provisions for judicial review of "agency actions," are contained in 5 U.S.C. §§ 701-706. *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Section 701 of the APA states that: "This chapter applies, according to the provisions thereof, except to the extent that— (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(1)-(2). "The standards to be applied on review are governed by the provisions of § 706. But before any review at all may be had, a party must first clear the hurdle of § 701(a)." *Heckler*, 470 U.S. at 828.

9

When analyzing a 701(a)(2) issue, courts evaluate the authorizing statute in order to determine whether or not the statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster v. Doe,* 486 U.S. 592, 600 (1988) ("§ 701(a)(2) requires careful examination of the statute on which the claim of agency illegality is based . . . ."). In *Webster*, the Court examined § 102 of the National Security Act (NSA) to determine whether the CIA Director's termination of the respondent was subject to judicial review. *Id*. Section 102(c) of the act allowed for the director to terminate an agency employee "whenever the Director 'shall deem such termination necessary or advisable to the interests of the United States' not simply when the dismissal *is* necessary or advisable to those interests." *Id*. The Court concluded that, "[t]his standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review." *Id*. Thus, the Court found that the "language of § 102 strongly" suggested "that its implementation was 'committed to agency discretion by law.'" *Id*.

The Supreme Court held similarly in *Heckler v. Chaney*. In *Heckler v. Chaney*, the respondents, several inmates sentenced to death by lethal injection, petitioned the FDA. *Heckler*, 470 U.S. at 823. The respondents claimed that although they had been approved for other purposes, the drugs used by Oklahoma and Texas for lethal injection had not been approved for use in human executions. *Id*. The respondents requested that the FDA take investigatory and enforcement actions against the State prison's use of these drugs. *Id*. at 824. The FDA Commissioner refused to take action, expressing that even if the FDA had jurisdiction over this matter it would decline based on "inherent discretion to decline to pursue certain enforcement matters." *Id*. at 825. In holding that the determination by the FDA not to exercise its enforcement authority over the use of drugs in interstate commerce was committed to agency discretion and judicially unreviewable, the Supreme Court expressed that:

> The danger that agencies may not carry out their delegated powers with sufficient vigor does not necessarily lead to the conclusion that courts are the most appropriate body to police this aspect of their performance. That decision is in the first instance for Congress, and we therefore turn . . . to determine whether . . . Congress has provided us with 'law to apply.' If it has indicated an intent to circumscribe agency enforcement discretion, and has **provided meaningful standards for defining the limits of that discretion,**

10

> **there is 'law to apply' under § 701(a)(2),** and courts may require that the agency follow that law; if it has not, then an agency refusal to institute proceedings is a decision 'committed to agency discretion by law' within the meaning of that section.

*Heckler*, 470 U.S. at 834-35 (emphasis added). The *Heckler* Court reaffirmed its recognition of the idea that "an agency's decision not to prosecute or enforce . . . is a decision generally committed to agency discretion by law." *Id*. at 831. Inclusive in the Court's reasoning was the rationale that "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id*.

In *Lincoln v. Vigil*, the Supreme Court revisited APA § 701(a)(2) and its "committed to agency discretion" clause. *Lincoln v. Vigil*, 508 U.S. 182 (1993). There, the defendant, Indian Health Service ("IHS"), received yearly lump-sum appropriations from Congress to expend under the Snyder and Indian Health Care acts. *Id*. at 186. Specifically, the Snyder Act conferred authority on IHS "to expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians for the relief of distress and conservation of health." *Id*. The Indian Health Care Improvement Act authorized "expenditures for, *inter alia*, Indian mental-health care, and specifically for therapeutic and residential treatment centers." *Id*. Although Congress never expressly appropriated the funds for the Indian Children's Program, from the late 1970's until about 1985 IHS provided services to handicapped children in the Southwest region of the United States. *Id*. However, in 1985, IHS reallocated the money used to fund the Program to "a nationwide effort to assist such children." *Id*. at 185.

Respondents—handicapped children eligible to receive services from the Program—brought an action against the Director of IHS in the District Court of New Mexico. *Vigil*, 508 U.S. at 189. The district court rejected the argument that IHS's decision was "committed to agency discretion by law." *Id*. The Court of Appeals affirmed. *Id*. However, the Supreme Court held that the "decision to allocate funds 'is committed to agency discretion by law.'" *Id*. at 193. "The allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Id*. at 192.

The *Vigil* opinion is instructive here in its recognition that allocation of funds from lump-sum appropriations "requires a complicated balancing of a number of factors which are peculiarly within its expertise: whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate . . . and 'indeed, **whether the agency has enough resources to fund a program 'at all.**'" *Id*. at 193 (emphasis added). The Court concluded that, as in *Heckler*, the agency was "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*.

Similar to *Heckler* and *Vigil*, Defendants' authorizing statute provides no substantive standards on which a court could base its review. The applicable statute conferring authority to the Director provides that:

> The Director "shall temporarily suspend allocations under subsection (a) by an enterprise upon a finding by the Director that such allocations—
> (1) are contributing, or would contribute, to the financial instability of the enterprise;
> (2) are causing, or would cause, the enterprise to be classified as undercapitalized; or
> (3) are preventing, or would prevent, the enterprise from successfully completing a capital restoration plan under section 4622 of this title.

12 U.S.C. § 4567(b) (2012). Section 4567(b) provides factors for when the Director *shall* temporarily suspend the allocations of the funds; however, there is no further direction regarding the manner by which the Director shall make the prescribed finding. For example, the Director shall suspend the Housing Trust Fund payments when those contributions would contribute to the financial instability of the enterprise; however, the statute provides no insight into what constitutes financial instability. This – and the language limiting the suspension to "a finding by the Director" – lends itself that the conclusion that the determination of when the payments should be suspended is within the discretion of the Director. Further justification that this was Congress's intent is the language that the Director shall suspend the payments not only when the payments are contributing to financial instability, but also when they would contribute to the enterprise's financial instability. There is a great amount of discretion inherent in the ability to decide when something will happen.

Analogous to the language in *Vigil*, 12 U.S.C. § 4567(b) reflects "congressional recognition that an agency must be allowed 'flexibility to shift' . . . funds within a particular . . . appropriation account so that' the agency 'can make necessary adjustments for unforeseen developments and changing requirements.'" *Vigil*, 508 U.S. at 193. In order to determine whether or not Defendants were justified in suspending the payments to the Housing Trust Fund, this Court would have to engage in a "complicated balancing of number of a factors which are peculiarly within [Defendants'] expertise"—something that the Supreme Court has continually refused to do. As in *Heckler* and *Vigil*, "the agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Vigil*, 508 U.S. at 193. Consequently, this matter appears to be one of those "rare instances" where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410.

## IV.   CONCLUSION

The Individual and Organizational Plaintiffs lack Article III standing because their alleged injuries are too remote from and not fairly traceable to the Defendants' allegedly unlawful conduct. Therefore, the alleged injuries are unlikely to be redressed by the requested relief. Moreover, 12 U.S.C. § 4567(b) – the applicable statute – provides no meaningful standards for determining when "an enterprise" is financially instable, undercapitalized, or in jeopardy of unsuccessfully completing a capital restoration plan. Considering the history of Fannie Mae and Freddie Mac; the government's placing Fannie Mae and Freddie Mac in conservatorship; the Treasury Department providing liquidity to Fannie Mae and Freddie Mac through preferred stock purchase agreements, the mortgage backed securities purchase program, and an emergency credit facility; it is not for this Court to judicially review Defendants' statutorily mandated suspension of payments into the Housing Trust Fund.

Having found that this Court lacks subject matter jurisdiction, I need not, and indeed should not, evaluate Defendant's Rule 12(b)(6) argument that Plaintiffs could not overcome their burden of showing prejudicial error.

For the aforementioned reasons, Defendants' Motion to Dismiss the First Amended Complaint (ECF No. 38) is **GRANTED**. Defendants' Renewed Request for Judicial Notice in Support of Their Motion to Dismiss the First Amended Complaint (ECF No. 39) is

**DENIED** *as moot*. Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief (ECF No. 30) is **DISMISSED** *with prejudice* for lack of jurisdiction. Pursuant to Federal Rule of Civil Procedure 58, a separate judgment will be entered contemporaneously.

**DONE and ORDERED** in chambers, at Miami, Florida, this 29th day of September 2014.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of record*